FILED

2015 May-29  PM 03:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CORNELIUS MAHONE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **2:14-cv-00535-AKK** |
| **CSX TRANSPORTATION, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

Cornelius Mahone, an African American who worked as a train conductor for CSX Transportation ("CSXT"), alleges that Melvin Murray, his Caucasian supervisor, treated him more harshly than similarly situated Caucasian co-workers, and that CSXT subjected him to racial harassment, and discharged him in retaliation for the two complaints he purportedly filed against Murray and his co-workers. Consequently, Mahone filed this lawsuit against CSXT alleging claims under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. *See* doc. 1. The court has for consideration CSXT's motion for summary judgment, doc. 30, which is fully briefed and ripe for review, docs. 36, 38. As the court will explain below, the motion is due to be granted because of Mahone's failure to establish a prima facie case for his retaliation and discrimination claims or to proffer evidence

that would allow a reasonable juror to find that CSXT's justification for his discharge was pretextual, and to take advantage of CSXT's corrective opportunities or establish that he experienced sufficiently severe or pervasive harassment.

## I. SUMMARY JUDGMENT STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear a burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration in original). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in the non-moving party's favor when sufficient competent evidence supports the non-moving party's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. FACTUAL ALLEGATIONS

### A.    CSXT and its Relevant Policies and Procedures

CSXT is a railway company that operates mainly along the eastern United States and Canada. Doc. 31-18 at 2. The terms and conditions of employment for

most of its roughly 30,000 employees are governed by a collective bargaining agreement ("CBA"), CSXT's operating rules, and the Federal Railway Labor Act. *Id.* Relevant here is CSXT's Individual Development and Personal Accountability Policy ("IDPAP"), a progressive disciplinary procedure that divides rule violations into three categories: minor, serious, and major. *Id.* at 2-4. Minor offenses normally result in informal counseling. *Id.* at 4; doc. 31-5 at 3. Serious offenses, on the other hand, while on their own are not "sufficient to warrant dismissal," can lead to "suspension and/or retraining . . . depending upon the circumstances," and a "third serious incident within three years may result in a dismissal."[1] Docs. 31-5 at 3; 31-18 at 4. Finally, major offenses "warrant removal from service pending a formal hearing and possible dismissal from service for a single occurrence if proven responsible."[2] Docs. 31-5 at 3-4; 31-18 at 5.

Serious or major offenses trigger a formal investigatory hearing to allow CSXT to develop facts and determine the employee's responsibility, if any, for the violation. Docs. 31-5 at 3-4; 31-12 at 2; 31-13 at 3; 31-18 at 5. The hearing, which is fully transcribed, is adjudicated by a hearing officer. The accused employee can utilize union representation, present witnesses and documentary evidence, and

---

[1] Serious offenses include leaving cars "in the foul," and "[o]ther incidents . . . depending on the circumstances." Doc. 31-5 at 3.

[2] Major offenses include "acts that cause harm to other persons or recklessly endanger the safety of employees or the public." Doc. 31-5 at 3-4.

cross examine adverse witnesses. Docs. 31-5 at 3-4; 31-18 at 5; *see also* docs. 31-13; 31-14. After the hearing officer issues her findings, a CSXT division manager reviews the transcript and the findings and independently decides whether to impose disciplinary measures. Doc. 31-22 at 5.

### B. Mahone's Employment and Discharge from CSXT

CSXT hired Mahone as a train conductor in 2006. Mahone reported directly to Murray, the Line of Road Trainmaster for the Mobile Division. Docs. 31-6 at 2; 31-19 at 2; 31-23 at 5. As part of his duties, Murray monitored adherence to CSXT rules and policies and federal railway regulations and, if necessary, assessed violations against noncompliant employees. Doc. 31-19 at 2-3.

### 1. Mahone's Alleged Exposure to Race Based Harassment

Mahone allegedly experienced several instances of racial harassment during his employment. Between 2008 and 2009, Mahone saw "less than five" personal automobiles in the CSXT parking lot with confederate flag stickers, one co-worker wearing a confederate flag shirt, "the N word" written on the wall of two bathroom stalls and a train engine, and a "pen scribbling" of "KKK . . . on the desk top of [a train engine]." Doc. 31-21 at 69-78, 80-81. Also, shortly after the Presidential election in 2008, after an African American trainmaster boarded Mahone's train to check Mahone's paperwork, Mahone's Caucasian co-worker commented that the

trainmaster "thinks that he has power" because of President Barack Obama's victory. *Id.* at 84-85. Mahone did not report these incidents to CSXT even though he received CSXT's anti-harassment policy.[3] *Id.* at 70, 73, 77, 79, 83-84.

The next incident of alleged harassment occurred in 2011 when Murray secretly boarded Mahone's train to observe Mahone and a Caucasian engineer's compliance with CSXT rules. *Id.* at 85-99. Although Murray charged Mahone and the engineer with a rules violation, Mahone maintains nonetheless that Murray treated him more harshly by "trying to find out everything that [Mahone did incorrectly]," "badgering" him, and assessing a rule violation against him for failing to call signals.[4] *Id.* at 88-90. As a result, Mahone challenged the violation and the resulting suspension, and ultimately prevailed and received back pay for the time he missed. *Id.* at 90. In addition, Mahone claims also that he lodged a complaint on the Hotline about this incident in May of 2012 in which he purportedly charged Murray with race discrimination.[5] Doc. 31-21 at 152-153.

---

[3] The policy "prohibits . . . employee[s] . . . from harassing another employee through racial or ethnic slurs,  . . . ." Docs. 31-3 at 2; 31-4; 31-17 at 4; 31-21 at 54-60. Victims are required to "report the incident to . . . Human Resources . . . or the . . . Toll Free Hotline ["the Hotline"] . . . ." Docs. 31-3 at 3; 31-17 at 4. The Hotline, which is operated by an independent company, maintains written records of each report it receives. Docs. 31-2 at 8; 31-17 at 6-7.

[4] Murray charged the engineer for using a mobile phone while operating a train. Doc. 31-21 at 92.

[5] CSXT has no record of a call by Mahone. CSXT has an anonymous complaint made against Murray in which the caller complained about assessments that are

*2. Allegations of Threatening Comments and the Staff Meeting*

The final incident of alleged racial harassment against Mahone traces its origin to September 26, 2011, when Christopher Ellis called the Hotline to report that, after he called Mahone "sleepyhead" over a train radio, Mahone called him on a mobile phone and threatened him. Doc. 31-9 at 3. Allegedly, Mahone stated that Ellis did not know who Ellis "was fucking with" and that "you don't know what can happen . . . faggott." *Id*. Later, a co-worker, who was with Mahone when Ellis made the "sleepyhead" comment, told Ellis that Mahone "said that he was going to do something to [Ellis] in Mobile[,] [Alabama] and . . . that he knew where [Ellis] lived . . . and for $500 he could get one of his buddies to take care of [Ellis]." Docs. 31-9 at 3; 31-17 at 6. In addition to calling the Hotline, Ellis complained to Murray, who in turn relayed the incident to Brian Barr, who was the assistant to Mark Mayo, the Atlanta Division Manager and Murray's direct Supervisor. Docs. 31-20 at 2; 31-23 at 4, 7. Barr instructed Murray to enter infractions against Ellis for improper use of a CSXT radio, and Mahone for threatening a co-worker (which is a major violation under the IDPAP). Docs. 31-5 at 4; 31-10 at 2; 31-19 at 4; 31-20 at 3; 31-23 at 5-7. Murray complied, and as a result, CSXT removed Mahone

---

similar to the rule violation assessments Murray made against Mahone. Doc. 31-8 at 3. However, the anonymous caller did not complain about alleged race discrimination, *id.* at 2-17, and, to further complicate the mystery, Mahone denies ever making an anonymous complaint to the Hotline, doc. 31-21 at 147.

from service pending an investigation. *See* docs. 31-5 at 3-4; 31-10 at 2; 31-21 at 111-112, 135, 138; 35-1 at 1:23:00.

To prevent Mahone from being discharged over the alleged threat, Mayo "decided to have the charge cancelled[.]" Docs. 31-20 at 3; 31-11 at 2. Mayo convened a meeting instead in November of 2011 (hereinafter "the staff meeting") with Mahone, Ellis, Murray, two union representatives, and two employees who witnessed the altercation. Docs. 31-11 at 2; 31-19 at 4; 31-20 at 3; 35-1 at 1:03:45; 1:09:30. During the staff meeting, which Mahone surreptitiously recorded, doc. 31-20 a 130-133, Mayo and the union representatives stressed the importance of observing regulations prohibiting mobile phone use while operating trains, and urged the employees to address personal disputes privately. *See* doc. 35-1 at 1:06:00. In response, a co-worker, presumably Ellis, asked if "you [sic] going to be able to do that without somebody come [sic] drive-bying your house?" *Id.* at 1:19:45. Several minutes later, the co-worker who allegedly heard Mahone make the threatening remarks claimed that he told Ellis to "watch [his] back . . . [because Mahone was going to] pay [his] homeboy $500 to ride by over at his house." *Id.* at 1:25:25. The meeting devolved into a shouting match between Mahone and his co-workers, while Mayo, Murray, and the union representatives tried to restore order. *Id.* at 1:25:00 – 1:26:40. During an interval, one of the union representatives insisted that Ellis needed assurances that Mahone would not "com[e] by his

8

house." *Id.* at 1:28:45. A shouting match again ensued, *id.* at 1:29:30, and Mahone

eventually claimed that the accusation against him amounted to racial harassment,

stating that if he did not, in fact, threaten Ellis, "that means [Mahone's co-workers]

sat down and said what they were going to put on paper in order for those

statements to match up[.] [T]hat is a hate crime . . . ." *Id.* at 1:33:21 (emphasis

added).The union representative insisted, however, that "this [was] not about a

black and white issue," *id.* at 1:33:20, and that Ellis needed assurances that there

would be no "drive-bys," *id.* at 1:40:30. Mayo, who did not discipline Mahone for

the alleged threat, made clear that he did not necessarily accept the allegations

against Mahone, and that if Mahone and his co-workers could not work together,

then CSXT "ain't the place for [them] to be . . . period." *See id.* at 1:36:00; docs.

31-21 at 230-231; 31-23 at 9.

### 4. Mahone's Alleged Violation of Rule 100-G and Discharge

Thirteen months after the staff meeting, Murray charged Mahone with

violating rule 100-G, which prohibits train operators from leaving railcars "within

100 feet of crossings equipped with automatic grade crossing warning devices . . .

." Doc. 31-14 at 2. Allegedly, Mahone left three train cars 52 ½ feet from a railroad

crossing, causing the crossing gates to remain activated, and forcing CSXT to

manually deactivate the gate and use crews to stop traffic while trains passed. *See*

docs. 31-12 at 2; 31-18 at 6; 31-23 at 14-15. This infraction qualified as a serious

9

violation under the IDPAP and resulted in Mahone's suspension pending an investigation and hearing. Docs. 31-6 at 2; 31-12 at 2; 31-14 at 2. At the formal hearing in January, 2013, Murray provided the relevant background, stating that he learned about the incident when he overheard a dispatcher request that trains stop so that crew members could halt traffic at the Pine Haven crossing. *See* doc. 31-13 at 7. According to Murray, when he arrived to investigate, he learned from the signal maintainer that Mahone caused the activation of the circuit that lowered the crossing gates by leaving several train cars too close to the north side of the railroad crossing. *Id.* at 8-9; *see also* docs. 31-18 at 6; 31-23 at 13-14. Murray added that he used a measuring wheel to determine that Mahone improperly left the train cars 52 ½ feet from the crossing. *See* doc. 31-13 at 12.

In response, Mahone testified that: (1) he "took the liberty and measured it off, [and] it was over 100 feet . . . ," *id.* at 11, (2) that the signal maintainer told Mahone that he did not see Murray measure the train track, *see id.* at 10, and (3) that Murray did not test the circuit or move the train cars to rule out another cause for the malfunction, *id.* at 15.  Mahone also introduced two photographs that purported to show that the train cars were not resting on the circuit. *Id.* at 13-14. However, Murray countered that the photographs simply depicted the unobstructed south end of the crossing. *Id.* at 13-14. The hearing ended without Mahone calling any witnesses to corroborate his contentions. *See* doc. 31-13.

Ultimately, the hearing officer found Mahone guilty of violating rule 100-G. Doc. 31-15 at 2. Subsequently, Jermaine Swafford, Mayo's replacement as the Atlanta Division Manager, reviewed the findings and the hearing transcript, and sustained the rule 100-G violation. Docs. 31-6 at 2-3; 31-18 at 6; 31-23 at 4. As a result, because this incident constituted Mahone's third serious rule violation in two years,[6] Swafford discharged Mahone. Docs. 31-15 at 2; 31-22 at 4.

### III. ANALYSIS

Mahone raises claims for retaliatory discharge (Count I), and race based discharge (Count II) and harassment (Count III). Doc. 17 at 6-9. The court will address these claims below, beginning with the retaliatory and race based discharge claims in Section A, and the hostile environment claim in Section B.

### A. Retaliatory (Count I) and Discriminatory Termination (Count II)

Because Mahone's termination claims are premised on circumstantial evidence, *see* doc. 36 at 26-30, the court applies the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, Mahone must first establish a prima facie case of retaliation and/or discrimination. *See, e.g.Gerard v. Board of Regents of the State of Georgia*, 324

---

[6] The two previous serious violations consisted of: (1) failure to mark "off duty," causing a train delay on April 21, 2011, and (2) releasing the handbrakes on standing cars and failure to provide point protection while coupling trains on April 29, 2012. *See* docs. 31-6 at 2-3; 31-18 at 6.

Fed. App'x 818, 825 (11th Cir. 2009); *Burke–Fowler v. Orange County., Fla.,* 447 F.3d 1319, 1323 (11th Cir. 2006). If Mahone satisfies his burden, "then [CSXT] must show a legitimate, nondiscriminatory reason for its employment action . . . If it does so, then [Mahone] must prove that the reason provided by [CSXT] is a pretext for unlawful discrimination [and/or retaliation]." *Burke–Fowler,* 447 F.3d at 1323 (citation omitted); *see also Gerard*, 324 Fed. App'x at 826. However, "[t]he ultimate burden of persuading the trier of fact that [CSXT] intentionally discriminated against [Mahone] remains at all times with [Mahone]." *Springer v. Convergys Customer Mgmt. Group Inc.,* 509 F.3d 1344, 1347 (11th Cir. 2007) (citation omitted).

*1. Mahone's Prima Facie Case of Retaliatory Termination*

"To establish a claim of retaliation under Title VII or § 1981, a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events." *Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209, 1212-13 (11th Cir. 2008). A plaintiff establishes a causal connection by showing that "(a) the decision-makers were aware of the protected conduct; and (b) the protected activity and the adverse [employment] action were not wholly unrelated." *McCann v. Tillman,* 526 F.3d 1370, 1376 (11th Cir. 2008) (quotation marks, and citations omitted). Here, Mahone maintains that CSXT discharged him in retaliation for calling the Hotline

in May of 2012 to report that Murray harassed him during the surprise inspection,

and for accusing his co-workers of committing a "hate crime" during the staff

meeting in November of 2011. *See* doc. 36 at 15, 23. More specifically, as Mahone

puts it in his brief, "[Mahone] accused his supervisor, Melvin Murray, of racial

discrimination on the ethics hotline and then a few months later, Melvin Murray

fabricate[d] a reason to assess [Mahone] with a disciplinary action that [led] to

[Mahone's] termination." Doc. 36 at 25. Even assuming that Mahone called the

Hotline in May 2012 as he maintains,[7] there is still a seven and nine month gap

between the alleged complaint and the two adverse employment actions (i.e. the

rule 100-G assessment (November, 2012) and the discharge (January, 2013)).

Moreover, there is an even longer gap (13 to 15 months) between the November,

2011staff meeting where Mahone claims he complained about "a hate crime" and

the adverse employment actions. This seven to thirteen month gap between the

protected activity and the adverse actions is simply too remote to prove causation.

*See, e.g. Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)

(three month gap is insufficient to prove causation); *see also Summers v. City of

Dothan*, 444 Fed. App'x 346, 351 (11th Cir. 2011) ("a three to four month period

between the date of the complaints and the date of the adverse employment action,

without more, is insufficient to establish causation.").

---

[7] CSXT has no record of such a complaint. *See supra* at n. 5.

In an attempt to overcome the temporal gap, Mahone points out that the Eleventh Circuit construes the causation element "broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated[.]" *See* doc. 36 at 25 (citing *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1278 (11th Cir. 2008)). Although this is an accurate statement of the law, it does not help Mahone because he has failed to proffer any evidence to suggest that Swafford or Murray intended to retaliate against him for reporting race discrimination or harassment, or to establish that his complaints and his discharge "are not completely unrelated." *See infra* at 19-21. In fact, the only argument or theory Mahone offers to support his retaliation claim is the purported temporal proximity between his complaints and the adverse actions. *See* doc. 36 at 22-25. Therefore, summary judgment is due to be granted on the retaliatory termination claim for failure to establish a prima facie case.

### 2. Mahone's Prima Facie Case of Discriminatory Termination

Mahone's discriminatory termination claim is based on the contention that Murray manufactured the rule 100-G infraction to orchestrate Mahone's discharge. *See* docs. 17 at 7-8; 31-21 at 86-100; 36 at 26-27, 29. As a threshold matter, CSXT contends that Mahone cannot establish a prima facie case because Mahone has not proffered evidence that CSXT treated similarly situated employees more favorably. Doc. 30-1 at 18-21. *See Butler,* 536 F.3d at 1215 (11th Cir. 2008) (requiring that a

plaintiff establish that she "was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class."). To support this contention, CSXT asserts that it discharged Mahone because he committed three serious rule violations within a two year period. Doc. 31-1 at 28-29. In response, focusing only on the last violation, *id.* at 14-15, Mahone claims that CSXT did not punish another employee who left a train within 100 feet of another railroad crossing, doc. 31-21 at 237-238. However, Mahone does not know the identity or race of this employee, the number of previous infractions this employee had accrued, or whether Murray had any involvement in the purported failure to charge the employee with a rule 100-G violation. *Id.* at 238, 241.The lack of specifics is fatal to Mahone's contention that he is similarly situated to this unidentified employee. *See Foster v. Biolife Plasma Serv's, L.P.*, 566 Fed. App'x 808, 811 (11th Cir. 2014) (requiring comparator to be comparable "all relevant aspects," and evidence that she engaged in conduct that is "nearly identical" to the plaintiff's) (citing *Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999)); *Amos v. Tyson Foods, Inc.*, 153 Fed. App'x 637, 647-48 (11th Cir. 2005) (unverifiable, anecdotal evidence of a comparator is insufficient to support a prima facie case) (citing *Bogle v. Orange County Bd. of County Com'rs*, 162 F.3d 653, 658 (11th Cir. 1998); *Pritchard v. Southern Co. Servs.*, 92 F.3d 1330, 1135 (11th Cir. 1996)); *Maniccia*, 171 F.3d at 1368 ("We require that the quantity and quality

of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.").

Perhaps recognizing this deficiency, Mahone attempts to salvage his discrimination claim by contending also that he "has identified at least three non-minority comparators which were treated more favorably than [Mahone] during the [staff] meeting." Doc. 36 at 26. In doing so, Mahone points to his three co-workers in the staff meeting CSXT held to address the alleged threat Mahone made against Ellis. The court is confounded by Mahone's reliance on these employees as comparators given that Mahone concedes that he was not disciplined as a result of these employees' allegations against him, *see* doc. 31-21 at 230-231; *see also Postell v. Green County Hosp. Auth.*, 265 Fed. App'x 856, 857 (11th Cir. 2008), and his concession that these employees' alleged infraction is premised on whether Mahone's version of the facts is true: "if I'm telling the truth . . . [then this] is a hate crime . . ." Doc. 35-1 at 1:33:21. Moreover, the alleged threats by Mahone that prompted the staff meeting played no role in the three serious violations that led to Mahone's discharge. *See* doc. 31-18 at 6; *see also supra* n. 6. Consequently, even if Mahone's supervisors treated his accusers more favorably than Mahone during the staff meeting – a contention the record does not support – that fact has no bearing on the separate and distinct incident that occurred a year later and which triggered Mahone's discharge. Furthermore, even if Mahone is correct about the

16

alleged favorable treatment, at best it establishes only that these three employees committed <u>one</u> infraction – two less than Mahone and the number necessary to trigger a discharge under the IDPAP. Put differently, because CSXT discharged Mahone for committing three serious infractions in a two year period, Mahone's reliance on these three employees as purported comparators is unavailing. For these reasons, CSXT is also due summary judgment on Mahone's discrimination claim.

### 3. Pretext

Alternatively, even assuming that Mahone can establish a prima facie case of discrimination and/or retaliation, summary judgment is still due because Mahone failed to show that CSXT's articulated reason for his discharge is pretextual. *See Burke–Fowler,* 447 F.3d at 1323. "To show pretext, [Mahone] must present sufficient evidence 'to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Gerard*, 324 Fed. App'x at 826 (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citation omitted)). Moreover, Mahone must make this showing through "concrete evidence in the form of specific facts which show that [CSXT's] proffered reason [was] mere pretext. Mere conclusory allegations and assertions [do] not suffice." *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009).

As legitimate reasons for discharging Mahone, CSXT points to the rule 100-G violation, and the two earlier serious violations, and maintains that it conducted a fair investigation that led to a good faith belief that Mahone violated rule 100-G. Doc. 30-1 at 13-14. To bolster its claim of a good faith belief, CSXT asserts that Swafford, the Atlanta District Manager, reviewed the evidence and the hearing officer's findings, and determined independently that Mahone violated rule 100-G. Doc. 31-1 at 21-22; *see also* docs. 31-18 at 6; 31-22 at 4. Mahone disagrees, and asserts that CSXT's contentions are pretextual because he did not violate rule 100-G, and that CSXT's evidence failed to prove his culpability because (1) no one saw Murray measure the distance between the train and the crossing, doc. 36 at 8, (2) CSXT failed to introduce Murray's measuring wheel as evidence during the hearing, *id.*, and that (3) Mahone's own photographs prove he complied with rule 100-G, *id.* at 9.[8] Unfortunately for Mahone, the proper inquiry is not whether CSXT had sufficient evidence to determine whether he violated rule 100-G, or whether Mahone *actually* violated the rule. Indeed, "[t]he law is clear that, even if a Title VII claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any *prima facie* case . . . by showing that it honestly believed the employee committed the violation." *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989); *see also Elrod v. Sears, Roebuck Co.*, 939 F.2d

---

[8] Mahone did not introduce these photographs as evidence during the hearing, and has not submitted them to the court. *See generally* docs. 31; 31-13; 35.

1466, 1470 (11th Cir. 1991) ("That the employee did not in fact engage in the misconduct reported to the employer is irrelevant to the question whether the employer believed the employee had done wrong.").

Here, Mahone failed to present any evidence at the hearing or to this court to establish that CSXT did not hold a fair hearing or honestly believed after the hearing that he violated rule 100-G. With respect to the fairness of the hearing, the record establishes that Mahone was represented by a union official and received the opportunity to testify, call his own witnesses, confront CSXT witnesses, and present documentary evidence. *See* docs. 31-5 at 3-4; 31-18 at 5. Ultimately, for reasons that are unclear, Mahone chose not to call the two co-employees who purportedly told him that they did not see Murray take measurements, *see* doc. 31-13, and relied instead on two photographs he could not identify with any specificity, doc. 31-13 at 13-14, a railroad crossing circuit diagram that he found on the internet, *id.* at 18-19, and his own testimony that measurements he took proved that he was in compliance with rule 100-G, *id.* at 20. Unfortunately for Mahone, after hearing the case, the hearing officer ultimately found against Mahone, and after independently reviewing the evidence, Swafford affirmed the hearing officer's findings. Docs. 31-6 at 2-3; 31-15 at 2; 31-18 at 6. Significantly, Mahone does not dispute that Swafford genuinely believed that Mahone violated rule 100-G. *See generally* doc. 36; *see also* docs. 31-18 at 6-7; 31-22 at 4-5.

Therefore, based on the record before this court, no basis exists for a finding that retaliatory or discriminatory animus motivated the hearing officer or Swafford's findings.

The court turns next to Mahone's contention that Murray's involvement tainted the decision. Specifically, "traveling under the cat's paw theory articulated in [*Staub v. Proctor Hospital*, 562 U.S. 411 (2011)]," doc. 36 at 1 n.1, Mahone contends that discriminatory and retaliatory animus motivated Murray's decision to charge him with violating rule 100-G, *id.* at 7. To support his position, Mahone claims that he "was subjected to unfavorable treatment from [Murray] on multiple occasions . . . was the victim of racial profiling in the [staff meeting] [,] [and that] [t]hese occasions elucidate Murray's attitude to favor Caucasian employees over and to the detriment of African American employees. . . ." *Id.* at 26. Allegedly, the "unfavorable treatment" consisted of Murray "[taking] the word of the Caucasian employees over that of [Mahone during the staff meeting,]" and assessing a violation against Mahone after his co-workers accused him of making threats against Ellis. *Id.* at 26-27. These contentions are unavailing, in part, because Murray did not "[take] the word" of any of Mahone's co-workers. In fact, as Mahone concedes, Murray sat mostly silent during the staff meeting, and generally deferred to Mayo, the organizer and leader of the meeting, who decided prior to the meeting not to discipline Mahone for the alleged threat. *See* docs. 31-20 at 2; 31-21

at 224. Furthermore, Murray's sole involvement in the incident – i.e. issuing the initial assessment against Mahone for the alleged threat – was at the direction of Brian Barr. Doc. 31-23 at 6-7.[9] Put simply, Mahone has failed to establish that Murray acted based on discriminatory animus, or that this alleged animus factored into CSXT's findings that Mahone committed three serious infractions in a two year period.

In short, based on this record, the court finds that Mahone has not proffered the required concrete evidence and specific facts to show that racial animus motivated Murray's decision to issue the 100-G assessment against Mahone, or that CSXT lacked a good faith belief to find that Mahone committed the 100-G infraction. Ultimately, Mahone's attempt to show pretext by arguing that he did not break CSXT rules misses the mark because "[t]he inquiry into pretext centers on [CSXT's] belief, not [Mahone's] beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010). Therefore, because § 1981

---

[9] Mahone challenges this contention as hearsay. Doc. 36 at 10-11. The statement is not hearsay because CSXT is offering it to demonstrate Murray's state of mind. *See* Fed. R. Evid. 803(3). Moreover, even if the statement is hearsay, "district courts may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999) (citations and internal quotation marks omitted). Here, Murray's supervisor's statement could be reduced to admissible form if, for example, CSXT produced him as a witness at trial.

and "Title VII do [] not require [CSXT's] needs and expectations to be objectively

reasonable" and "it is not [this court's] role to second guess the wisdom of an

employer's business decisions . . . as long as those decisions were not made with a

discriminatory motive," *id.*, summary judgment is due to be granted on Mahone's

discrimination and retaliation claims.

### B. Race Based Hostile Work Environment (Count III)

Finally, Mahone claims that CSXT subjected him to a racially hostile

environment. Doc. 17 at 8-9. Mahone's claim consists of several incidents that

occurred between 2008 and 2011, none of which are actionable. The first group,

which occurred in 2008 and 2009, consists of the following: Mahone observed (1)

"less than five" confederate flag stickers on co-workers' vehicles in the parking lot,

doc. 31-21 at 69-71, (2) one co-worker wearing a confederate flag shirt, *id.* at 80-

81, (3) two instances of bathroom graffiti containing "the N-word," *id.* at 72-78,

(4) one instance of graffiti on a train that stated "KKK," *id.*, and (5) one instance of

a Caucasian engineer commenting that an African American trainmaster thought

he had more power because of President Barack Obama's election, *id.* at 84-85.

Unfortunately, Mahone cannot rely on these incidents to support his claim because

he never reported them to CSXT, *see* docs. 31-4; 31-21 at 70, 73, 77, 79, 83-84,

despite CSXT's promulgation of several anti-harassment policies, which CSXT

trained its employees, including Mahone, to utilize, *see* docs. 31-1; 31-2; 31-3. As

the Eleventh Circuit has noted, "once an employer has promulgated an effective anti-harassment policy and disseminated that policy and associated procedures to its employees, then it is incumbent upon the employees to utilize the procedural mechanisms established by the company specifically to address problems and grievances." *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1300 (11th Cir. 2000) (internal quotation marks omitted). Therefore, because "'the problem of workplace discrimination . . . cannot be [corrected] without the cooperation of the victims,'" *id.* at 1302 (quoting *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1366 (11th Cir. 1999)), Mahone is precluded from relying on conduct he never reported to support his claim, *see, e.g. id.*at 1302-03; *see also Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548, 1554-55 (11th Cir. 1997).

The next group of alleged harassment consists of the incident where Murray secretly observed Mahone and his co-worker and charged both with rule violations, *see* doc. 31-21 at 88-89, and the staff meeting where Mahone's co-workers accused Mahone of threatening to send his "homeboys" after Ellis, *see id.* at 107-141. Neither incident rises to the level necessary to establish a claim because, with respect to the observation incident, Mahone has failed to show how this incident constituted "harassment [] based on his membership in the protected group[.]" *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012). However, it is clear from the record that the alleged harassment is based solely on Mahone's

belief that Murray scrutinized him more than his Caucasian counterpart (even though Murray also issued this employee a citation). *See* doc. 31-21 at 89. Because "Title VII [and § 1981] prohibit[] discrimination[] [and are] not a shield against harsh treatment at the work place," *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986) (internal quotation marks omitted), absent further objective evidence of racial animus, this incident is insufficient to support a race harassment claim.

Likewise, the accusations against Mahone in the staff meeting CSXT held to address, in part, the alleged threats Mahone made against Ellis also fail to support a harassment claim. During the meeting, a co-worker reported that Mahone threatened Ellis by purportedly stating he would arrange for his "homeboys" to do a "drive-by" against Ellis in retaliation for Ellis calling Mahone "sleepyhead." Docs. 31-9 at 3; 31-17 at 6. Mahone vehemently denied the accusation and accused his co-workers of a "hate crime": "Let's just say this . . . let's just say this. If I'm telling the truth . . . if . . . if I'm telling the truth that means these guys sat down and said what they were going to put on paper in order for those statements to match up. That is a hate crime, I don't care who said." Doc. 35-1 at 1:33:21. Based on this incident, Mahone contends in his brief that "[t]he [w]hite employees were [inaccurately] painting a picture of a black thug and a black gangster, speaking black gangster talk." Doc. 36 at 19. Presumably, according to Mahone, in reporting

that Mahone threatened to ask his "homeboys" to do a "drive by," his coworkers were racially harassing him by accusing him of "speak[ing] black gangster talk."

There are several problems with Mahone's contentions. First, there is a difference between being called offensive words (which may rise to a hostile environment depending on the circumstances) and being accused of directing purportedly offensive language at a victim. The latter is simply an allegation against a person and, even if false, does not rise to a "hate crime" merely because the allegation contains racially offensive language or is made by persons of a different race. While Mahone believes that his co-workers fabricated the report, however, as Mahone conceded in the meeting, a purported "hate crime" exists only "if [Mahone is] telling the truth . . . ." Doc. 35-1 at 1:33:21. To hold under these facts that the co-workers' accusation against Mahone created a hostile work environment would mean that victims of harassment can face accusations of alleged harassment solely because the victims repeated in their complaint the alleged harassing language purportedly directed at them. Such a result would have a chilling effect in the workplace, would likely discourage employees from utilizing complaint procedures to report alleged harassment, and would frustrate employers' efforts to rid the workplace of offensive and discriminatory conduct. Moreover, even if filing a complaint against an employee can form the basis of that accused employee's harassment claim, this single instance of alleged racial

25

harassment here is insufficient to establish the severe or pervasive conduct necessary to support Mahone's claim.  *See, e.g. Alexander v. Opelika City Schools*, 352 F. App'x 390, 392 (11th Cir. 2009) ("we have stated that racial slurs allegedly spoken by coworkers had to be so commonplace, overt and denigrating that they created an atmosphere charged with racial hostility."). Finally, Mahone's race harassment claim fails because he cannot establish that a basis exists to hold CSXT liable for the alleged conduct by his co-workers in the staff meeting. Based on the audio recording Mahone created, it is clear that Mayo addressed the concerns, including Mahone's contention of a "hate crime," by, among other things, reassuring Mahone that Ellis should not have called Mahone a "sleepyhead," doc. 35-1 at 1:35:28, indicating that he did not necessarily accept the allegations against Mahone, *id.* at 1:36:00, and asserting that if Mahone and his co-workers could not work together without making accusations against each other, then "[CSXT] ain't the place for you to be . . . period." *Id.* at 1:36:30. Significantly, Mayo's response proved effective because Mahone does not allege the recurrence of any similar-type conduct by his co-workers. *See Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1316 (11th Cir. 1989) (employer was not liable when the alleged harassment ended after the employer took remedial measures).

26

## IV. CONCLUSION

For these reasons, CSXT's motion for summary judgment is due to be granted. The court will enter a separate order consistent with this opinion.

**DONE** the 29th day of May, 2015.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE